1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

10

11   BRANDON LEE WOLCOTT,

12             Plaintiff,

13        v.

14   BOARD OF RABBIS OF NO. & SO.
     CALIFORNIA, et al.,

15

16             Defendants.

**Case No.  1:14-cv-00936-JLT (PC)**

**FINDINGS AND RECOMMENDATIONS TO DISMISS ACTION FOR FAILURE TO STATE A COGNZIABLE CLAIM**

**(Doc. 16)**

**30-DAY DEADLINE**

17   **I.      Background**

18           Plaintiff has filed a Second Amended Complaint in which he has tailored his allegations

19   and narrowed the list to four Defendants against whom he seeks damages based on his inability to

20   convert to the Jewish faith.  Based on the findings set forth below, the Court recommends that this

21   action be **DISMISSED** because of Plaintiff's failure to state a cognizable claim, despite the Court

22   repeatedly providing him the applicable legal standards.

23           **A.      Screening Requirement**

24           The Court is required to screen complaints brought by prisoners seeking relief against a

25   governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The

26   Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally

27   frivolous, malicious, fail to state a claim upon which relief may be granted, or that seek monetary

28

1    relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1),(2); 28 U.S.C.

2    § 1915(e)(2)(B)(i)-(iii).

3    **B.      Plaintiff's Second Amended Complaint**

4         Plaintiff complains of acts related to his inability to convert to the Jewish faith at

5    California Substance Abuse Treatment Facility ("SATF") in Corcoran, California.  In this

6    pleading, Plaintiff has narrowed the list of Defendants to four -- Former CDCR Secretary

7    Matthew Cate, Former Staff Jewish Chaplain Jared Sharon, Former Warden Kathleen Allison,

8    and Staff Jewish Chaplain Lon Moskowitz.  Plaintiff seeks preliminary and permanent injunctive

9    relief allowing him to convert to Judaism and seeks monetary damages.

10        Plaintiff complains that his inability to convert to Judaism has violated his right to

11   "Freedom of Religion."  (Doc. 16, 2ndAC, at p. 3.)  Plaintiff alleges that the CDCR's

12   "Departmental Operations Manual ("DOM") Article 6, Section 101060.4 requires staff chaplains

13   to provide inmates with confirmations (i.e. conversions) as part of their pastoral duties."  (*Id.*)

14   Plaintiff alleges that conversion is essential since Judaism worship is community based, like an

15   extended family, and he must go through conversion to "be regarded as Jewish in the view of the

16   religion."  (*Id.*)  Plaintiff alleges that he is serving a life sentence and has requested formal

17   conversion but that Chaplain Sharon has denied his request stating, "that the CDCR chaplain

18   policy does not allow inmates to convert to Judaism."  (*Id.*, at p. 4.)  Because he has not been

19   allowed to convert to Judaism, Plaintiff alleges that he has suffered discrimination.  (*Id.* at p. 5.)

20        Plaintiff also alleges that after Plaintiff sent Chaplain Sharon a proposal in June 2009,

21   Sharon informed Plaintiff that some of the senior Jewish chaplains, who attended the last state-

22   wide conference were sympathetic to Plaintiff's situation and felt inmates serving life sentences

23   should be afforded the opportunity to convert to Judaism while incarcerated.  (Doc. 16, 2ndAC, at

24   p. 6)  Sharon agreed to submit Plaintiff's proposal, but did not have authority to approve it.  (*Id.*)

25        In August 2010, when it had been more than a year since this communication with

26   Chaplain Sharon and he had still not been allowed to convert, Plaintiff filed an Inmate Appeal

27   ("IA").  (*Id.*)  That same month, Chaplain Sharon interviewed Plaintiff regarding his IA and

28   became upset at Plaintiff, but thereafter granted Plaintiff's appeal stating that he would provide

Plaintiff with a course of study and a para-rabbi "to prepare him for conversion and that upon completion Plaintiff would be presented to a Beit Din (Jewish Court of Judgment) that is approved by the Board of Rabbis." (*Id.*, at p. 7.)

Plaintiff alleges that in September 2010 he was diagnosed with central serious retinopathy and macular edema as a result of the stress he experienced from being denied conversion. (*Id.*)

On an occasion between August and October 2010, Plaintiff was not allowed to don Tefillin by the Aleph Institute because Chaplain Sharon indicated that he had not been allowed to convert. (*Id.*)  Likewise, the Aleph Institute does not allow Plaintiff to purchase religious packages because he has not converted. (*Id.*)

In November 2010, Plaintiff was put in contact with a para-rabbi as a result of Chaplain Sharon partially granting Plaintiff's August 2010 IA. (*Id.*)  After corresponding with Plaintiff, the para-rabbi indicated that she believed Plaintiff was prepared to make his conversion and she emailed Chaplain Sharon advising of this fac. (*Id.*)  However, Chaplain Sharon made no attempt to present Plaintiff to a Beit Din for conversion, so Plaintiff filed a second IA which Chaplain Sharon partially granted on February 1, 2011. (*Id.*)

In the partial grant, Chapalin Sharon indicted that, as of that date, the Board of Rabbis had not officially approved the conversion of those serving life sentences to Judaism.  Sharon noted that the Board may grant approval on a case by case basis and that he would maintain contact with the Board through Rabbi Moskowitz, and "would inform Plaintiff when and under what conditions conversion to Judaism for lifers is approved." (*Id.*, at pp. 7-8.)  Later that same month, Plaintiff learned that the loss of color and light in his vision was permanent. (*Id.*, at p. 8.)  Plaintiff also alleges he has suffered four "mini strokes" because of not being allowed to convert to Judaism. (*Id.*, at pp. 8-9.)

On February 18, 2011, Plaintiff appealed his second IA to the Second Level, seeking presentation to the Beit Din for conversion examination. (*Id.*, at p. 8.)  Warden Allison denied Plaintiff's request stating that the Board of Rabbis had not officially approved conversion to Judaism for lifers and that Chaplain Sharon was mistaken to have partially granted Plaintiff's IA. (*Id.*)  On April 12, 2011, Plaintiff appealed his second IA to the Third Level where Secretary Cate

1   denied it stating penological reasons existed for the denial and that the decision not to present

2   Plaintiff to the Beit Din for Judaism conversion was within the institution's scope of authority.

3   (*Id.*)

4          Between August and October of 2011, the Aleph Institute sent two rabbinic school

5   graduates to conduct services for Jewish inmates, but they did not allow Plaintiff to worship with

6   them because Chaplain Sharon indicated that he had not been allowed to convert.  (*Id.*)

7          For the reasons discussed in greater detail below, these allegations do not state any

8   cognizable claims such that his action should be dismissed.  Further, despite repeatedly providing

9   the applicable legal standards and opportunity to amend, and even having cognizable claims

10  identified in the prior screening order, Plaintiff fails to state any cognizable claims in the 2ndAC.

11  Thus, it appears futile and likely to encourage fabrication[1] to grant Plaintiff further opportunity to

12  amend.  *Akhtar v. Mesa*, 698 F.3d 1202, 1212-13 (9th Cir. 2012).

13         **C.       Legal Standards**

14         The below legal standards for the claims Plaintiff is attempting to state were specifically

15  stated in the prior screening order.  (Doc. 15.)  They are restated herein since pivotal to the

16  dismissal of this action and in the hopes that by doing so, Plaintiff may be assisted in

17  understanding why he cannot pursue claims under § 1983 despite what seems to be a heart-

18  wrenching ordeal for him.

19         **1. Religion**

20         Prisoners "do not forfeit all constitutional protections by reason of their conviction and

21  confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

22  Inmates retain the protections afforded by the First Amendment, "including its directive that no

23  law shall prohibit the free exercise of religion."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348

24  (1987) (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)).  However, " '[l]awful

25  incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a

26  retraction justified by the considerations underlying our penal system.' "  *Id*. (quoting *Price v.*

27

28

---

[1] As discussed in further detail below, some of the allegations in the 2ndAC directly contradict allegations in the 1stAC which supports that fabrication may have already taken place.

4

1    *Johnston*, 334 U.S. 266, 285 (1948)).

2         Claims for violation of the Free Exercise Clause of the First Amendment, RLUIPA, and

3    the Establishment Clause are used to challenge state or government statutes, regulations, and/or

4    established policies.  Thus, in order to state a cognizable claim for their violation, a plaintiff must

5    identify an allegedly offending statute, regulation, or established policy.  Claims regarding

6    independent actions by state actors who are not following a statute, regulation, or established

7    policy are not cognizable under § 1983 for violation of a plaintiff's rights under the Free Exercise

8    Clause, RLUIPA, or the Establishment Clause.  However, a cognizable claim may be stated for

9    violation of a Plaintiff's rights under the Equal Protection Clause for discriminatory actions by

10   individual state actors who are not following a statute, regulation, or established policy.

11              **a. First Amendment -- Free Exercise**

12        The First Amendment, applicable to state action by incorporation through the Fourteenth

13   Amendment, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947), "prohibits government

14   from making a law 'prohibiting the free exercise [of religion].' " *Cruz*, 405 U.S. at 322 (alteration

15   in original). A prisoner's right to freely exercise his religion, however, is limited by institutional

16   objectives and by the loss of freedom concomitant with incarceration. *O'Lone*, 482 U.S. at 348.

17        A prison regulation may therefore impinge upon an inmate's right to exercise his religion

18   if the regulation is "reasonably related to legitimate penological interests." *Shakur v. Schriro*, 514

19   F.3d 878, 884 (9th Cir. 2008) (citations omitted).  In contesting the validity of a prison regulation,

20   an inmate must also show that his religious practice is "sincerely held" and "rooted in religious

21   belief." *Id.* at 884-85.  For screening purposes, it is assumed that Plaintiff's Jewish belief is

22   sincerely held and the practices he desires are rooted in his Jewish beliefs.

23                     **b. RLUIPA**

24        A prisoner's ability to freely exercise his religion is also protected by the Religious Land

25   Use and Institutionalized Persons Act ("RLUIPA").  42 U.S.C. § 2000cc-1.  Section 3 of RLUIPA

26   provides that "[n]o government shall impose a substantial burden on the religious exercise of a

27   person residing in or confined to an institution . . . even if the burden results from a rule of

28   general applicability," unless the government shows that the burden is "in furtherance of a

1  compelling government interest" and "is the least restrictive means of furthering . . . that interest."

2  42 U.S.C. § 2000cc–1(a) (2012). "While [RLUIPA] adopts a compelling governmental interest

3  standard, [c]ontext matters in the application of that standard." *Cutter v. Wilkinson*, 544 U.S. 709,

4  722–23 (2005) (alteration in original) (internal quotation and citation omitted).   Thus, "[c]ourts

5  are expected to apply RLUIPA's standard with due deference to the experience and expertise of

6  prison and jail administrators in establishing necessary regulations  and procedures to maintain

7  good order, security and discipline, consistent with consideration of costs and limited resources."

8  *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1124-25 (9th Cir. 2013) (citing

9  *Cutter*, 544 U.S. at 723) (internal quotation marks omitted).

10       Under RLUIPA, plaintiffs bear the initial burden of persuasion on whether the Policy

11  "substantially burdens" their "exercise of religion." § 2000cc–2(b). RLUIPA defines "religious

12  exercise" to include "any exercise of religion, whether or not compelled by, or central to, a

13  system of religious belief." § 2000cc-5(7)(A). A "substantial burden" occurs "where the state ...

14  denies [an important benefit] because of conduct mandated by religious belief, thereby putting

15  substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Warsoldier*

16  *v. Woodford*, 418 F.3d 989, 995 (9th Cir.2005) (alteration in original) (quotation omitted).

17       Damages claims are not available under the RLUIPA against prison officials in their

18  individual capacity, *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014); nor in their official capacity

19  because of sovereign immunity, *Sossamon v. Texas*, --- U.S. ---, 131 S.Ct. 1651 (2011); *Alvarez v.*

20  *Hill*, 667 F.3d 1061, 1063 (9th Cir. 2012).

21                      **c.  The Establishment Clause**

22       A government act is consistent with the Establishment Clause if it: (1) has a secular

23  purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion;

24  and (3) does not foster excessive governmental entanglement with religion.  *Vasquez v. Los*

25  *Angeles ("LA") County*, 487 F.3d 1246, 1255 (9th Cir. 2007) citing *Lemon v. Kurtzman*, 403 U.S.

26  602 (1971).  It is appropriate to test the viability of a plaintiff's claim of violation of the

27  Establishment Clause under *Lemon* upon screening.  *Vasquez,* 487 F.3d at 1255.

28       Under *Lemon*, a government act is consistent with the Establishment Clause if it: (1) has a

1   secular purpose; (2) has a principal or primary effect that neither advances nor disapproves of

2   religion; and (3) does not foster excessive governmental entanglement with religion.  *See Lemon*,

3   403 U.S. at 612-13; *Brown v. Woodland Joint Unified Sch. Dist*., 27 F.3d 1373, 1378 (9th

4   Cir.1994).

5          In considering the appropriate balance of these factors, evaluation of penological

6   objectives is committed to the considered judgment of prison administrators, "who are actually

7   charged with and trained in the running of the particular institution under examination." *Bell*, 441

8   U.S. at 562.  *See Turner*, 482 U.S., at 86-87.  To ensure that courts afford appropriate deference

9   to prison officials, prison regulations alleged to infringe constitutional rights are judged under a

10  "reasonableness" test which is less restrictive than that ordinarily applied to alleged infringements

11  of fundamental constitutional rights.  *See, e.g., Jones v. North Carolina Prisoners' Labor Union,*

12  *Inc.,* 433 U.S. 119, 128 (1977).  The proper standard is that "when a prison regulation impinges

13  on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate

14  penological interests." *Turner,* 482 U.S. at 89.

15                     **d. Fourteenth Amendment -- Equal Protection**

16         "The Equal Protection Clause requires the State to treat all similarly situated people

17  equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir.2008) (citation omitted).  This does not

18  mean, however, that all prisoners must receive identical treatment and resources.  *See Cruz*, 405

19  U.S. at 322 n. 2; *Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir. 1993); *Allen v. Toombs*, 827 F.2d 563,

20  568–69 (9th Cir. 1987).

21         "To state a § 1983 claim for violation of the Equal Protection Clause a plaintiff must show

22  that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon

23  membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166-67 (9th

24  Cir. 2005) (citation and quotations omitted).  "The first step in equal protection analysis is to

25  identify the [defendants' asserted] classification of groups." *Id.* (quoting *Freeman v. City of*

26  *Santa Ana*, 68 F.3d 1180, 1187 (9th Cir.1995)).  The groups must be comprised of similarly

27  situated persons so that the factor motivating the alleged discrimination can be identified.  *Id.*  An

28  equal protection claim will not lie by "conflating all persons not injured into a preferred class

7

1   receiving better treatment" than the plaintiff.  *Id.* (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57

2   (6th Cir.1986)).

3       If the action in question does not involve a suspect classification, a plaintiff may establish

4   an equal protection claim by showing that similarly situated individuals were intentionally treated

5   differently without a rational relationship to a legitimate state purpose.  *Village of Willowbrook v.*

6   *Olech*, 528 U.S. 562, 564 (2000); *San Antonio School District v. Rodriguez*, 411 U.S. 1 (1972);

7   *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir.2004); *Sea River Mar.*

8   *Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002).  To state an equal protection

9   claim under this theory, as a "class of one" a plaintiff must allege that:  (1) the plaintiff is a

10  member of an identifiable class; (2) the plaintiff was intentionally treated differently from others

11  similarly situated; and (3) there is no rational basis for the difference in treatment.  *Village of*

12  *Willowbrook*, 528 U.S. at 564.  To establish any violation of the Equal Protection Clause, the

13  prisoner must present evidence of discriminatory intent.  *See Washington v. Davis*, 426 U.S. 229,

14  239-240 (1976); *Serrano v. Francis*, 345 F.3d 1071, 1081-82 (9th Cir. 2003); *Freeman v. Arpio*,

15  125 F.3d 732, 737 (9th Cir. 1997).  Further, where a challenged government policy is facially

16  neutral, disproportionate impact on an identifiable group will satisfy the intent element, but only

17  if it tends to show that some invidious or discriminatory purpose underlies the policy.  *See Lee v.*

18  *City of Los Angeles,* 250 F.3d 668, 686-87 (9th Cir. 2001).

19      The first step in determining whether prison staff violated Plaintiff's right to equal

20  protection is to identify the relevant class to which he belonged.  *See Thornton v. City of St.*

21  *Helens*, 425 F.3d 1158, 1166 (9th Cir.2005).  "The groups must be comprised of similarly

22  situated persons so that the factor motivating the alleged discrimination can be identified."  *Id.* at

23  1167.  "An equal protection claim will not lie by 'conflating all persons not injured into a

24  preferred class receiving better treatment' than the plaintiff."  *Id.,* quoting *Joyce v. Mavromatis*,

25  783 F.2d 56, 57 (6th Cir.1986).

26              **3.  Plaintiff's Inability to Convert to Judaism**

27      The prior screening order specified why Plaintiff could not proceed on claims against

28  Chaplains Sharon and Moskowitz, among others, and specifically directed Plaintiff to neither

8

1   name them, nor again attempt to state any claims against them.  Despite this, Plaintiff persisted to

2   name Chaplains Sharon and Moskowitz as Defendants in the 2ndAC.  Thus, the Court again

3   recites the reasons why Plaintiff may not proceed against them.

4          An initial determination must be made whether Chaplains Sharon and Moskowitz were

5   "state actors" or acting "under color of state law" in order for Plaintiff to proceed against them in

6   this action both on his claims under § 1983 and RLUIPA -- for which the same standard applies.

7   *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011).  The first step

8   in the determination is whether the deprivation is the result of a governmental policy. *Id. ref*

9   *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 835 (9th Cir. 1999) citing *Lugar v.*

10  *Edmondson Oil, Co.*, 457 U.S. 922, 937 (1982).  In all three versions of his allegations, Plaintiff

11  alleges that his religious exercise was burdened by not being allowed to convert to the Jewish

12  faith.

13         However, in both the Original Complaint and 1stAC Plaintiff made it very clear that the

14  policy that prohibited inmates from converting to Judaism was the policy of the Jewish

15  organization/structure -- not the CDCR.  In the 1stAC, Plaintiff alleged, and attached exhibits that

16  made it clear, that his inability to convert to Judaism was the policy of the Southern California

17  Board of Rabbis and the California Commission of Jewish Chaplains -- to whom the various

18  Jewish Chaplains who operate within the CDCR report.  (*See* Doc. 13, 1stAC, at pp. 6:13-9:26,

19  177, 179, 184, 205.)  Whether Chaplains Sharon and Moskowitz (under the Board of Rabbis)

20  were the only Jewish organization/structure operating in the CDCR does not transform their

21  internal, religious policy into government policy.  *Florer*, 639 F.3d at 923-24.  Thus, in the

22  Original Complaint and 1stAC, the Court found that Plaintiff did not show that his inability to

23  convert to the Jewish faith was the result of governmental policy.[2]

24         Now, in the 2ndAC, Plaintiff alleges that "the CDCR chaplain policy does not allow

25  inmates to convert to Judaism."  (Doc. 16, p.4.)  The change in Plaintiff's pleading to allege that it

26

---

27  [2] The fact that Plaintiff is an inmate also does not entitle him greater consideration by the governing board of his
    religion than a person not incarcerated.  Thus, conversion may only be obtained by compliance with the requirements

28  adopted by his religious leaders.

9

1   is a CDCR policy that is preventing him from converting to Judaism is disingenuous and need not

2   be accepted since clearly contradictory to both his prior allegations and the supporting exhibits he

3   submitted therewith.  The policy prohibiting inmates from converting to Judaism is not a

4   governmental policy, so it does not provide a basis for a cognizable claim for violation of

5   Plaintiff's rights under the Free Exercise Clause of the First Amendment, RLUIPA, and the

6   Establishment Clause.

7        Further, neither Chaplain Sharon nor Moskowitz may fairly be considered a state actor.

8   The Supreme Court has held that "state action may be found if, though only if, there is such a

9   close nexus between the State and the challenged action that seemingly private behavior may be

10  fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,

11  531 U.S. 288, 295 (2001) (internal quotations and citation omitted).  The Supreme Court has

12  identified at least seven approaches to assess whether a private party has acted under color of

13  state law.  *Brentwood Acad.*, 531 U.S. at 296.  The most likely to be applicable in this situation is

14  either the "public function" or "joint action" approach.

15       "Under the public function test, when private individuals or groups are endowed by the

16  State with powers or functions governmental in nature, they become agencies or instrumentalities

17  of the State and subject to its constitutional limitations."  *Lee v. Katz*, 276 F.3d 550, 554-55 (9th

18  Cir. 2002).  "The public function test is satisfied only on a showing that the function at issue is

19  'both traditionally and exclusively governmental.' "  *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th

20  Cir. 2003) (quoting *Lee*, 276 F.3d at 555).  It has specifically been held that a prison chaplain, and

21  organizations with which the chaplain was affiliated, were not engaged in state action when they

22  refused to provide an inmate religious materials or services and refused to recognize the inmate as

23  Jewish -- such actions were determined to be ecclesiastical rather than public functions.  *Florer*,

24  639 F.3d at 925-26.  Thus, the action by Chaplains Sharon and Moskowitz, of failing to facilitate

25  Plaintiff's conversion, is not a public function.

26       Under the "joint action" approach, "[p]rivate persons, jointly engaged with state officials

27  in the prohibited action, are acting 'under color' of law."  *Lugar*, 457 U.S. at 941.  This occurs

28  when "the state has so far insinuated itself into a position of interdependence with the private

1   entity that it must be recognized as a joint participant in the challenged activity.  This occurs

2   when the state knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley*,

3   326 F.3d at 1093 (internal quotations and citation omitted).  Whether an inmate is a follower of a

4   particular religion is an ecclesiastical answer to a religious doctrine, not an administrative

5   determination; whereas a decision whether an inmate should be put on an internal prison list as

6   following a particular religion is an administrative determination, *Florer*, 639 F.3d at 926-27, and

7   Plaintiff does not allege that he is not on the list identifying him as Jewish for purposes within the

8   facility, nor do his allegation imply this.  In order to be "joint action" the prison must have

9   engaged in activity with the charged defendant such as desiring the defendant to determine that an

10  inmate is not of a particular religion, or the prison must have derived a benefit from such

11  determination.  *Id.*  There is no basis, even under the most liberal interpretation of Plaintiff's

12  allegations, upon which the trier of fact could determine that the prison engaged in any activities

13  showing a desire or benefit to be derived from Chaplains Sharon and Moskowitz denying

14  Plaintiff's requests to convert to Judaism.  Thus, Defendants Chaplains Sharon and Moskowitz

15  were not state actors or acting under color of state law when they denied Plaintiff's conversion to

16  the Jewish faith for Plaintiff to proceed against them for violation of his rights under the Free

17  Exercise Clause of the First Amendment, RLUIPA, and/or the Establishment Clause.

18          Further, Plaintiff offers no allegations to suggest that he was unilaterally denied Jewish

19  accommodations and/or religious items needed to exercise his faith because he was not allowed to

20  formally convert to Judaism.  The religious activities that Plaintiff alleges have been infringed

21  include: being prohibited from attending a service also attended by two Yeshivah (rabbinic

22  school) graduates (Doc. 16, 2ndAC, at 8:22-25); not being permitted to attend a session when the

23  Aleph Institute sent a visiting rabbi to speak with Jewish inmates and allow them to don Tefillin

24  (*id.*, at 7:13-18); and not being allowed to purchase religious packages by a the Aleph Institute

25  that regarded him as a non-Jew (*id.*, at 7:19-21).  Notably, Plaintiff was prohibited from engaging

26  in religious activities in these instances by the Aleph Institute -- which is an outside, religious

27  organization that has not been, and cannot be, pursued in this action. Thus, Plaintiff fails and is

28  unable to state a cognizable claim against Chaplains Sharon and Moskowitz.

11

### 4. Supervisory Liability via Inmate Appeals

Plaintiff named Secretary Cate and Warden Allison as defendants because they held supervisory positions in that they reviewed his IAs regarding his inability to convert to the Jewish faith at the Second and Third Levels.

Generally, supervisory personnel are not liable under section 1983 for the actions of their employees under a theory of *respondeat superior* -- when a named defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged.  *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979).  To state a claim for relief under this theory, Plaintiff must allege some facts that would support a claim that supervisory defendants either:  personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

To show this, "a plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.  The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right." *Redman v. County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)(internal quotation marks omitted)(abrogated on other grounds by *Farmer v. Brennan*, 511 U.S. 825 (1994).

"The requisite causal connection can be established . . . by setting in motion a series of acts by others," *id*. (alteration in original; internal quotation marks omitted), or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir.2001).  "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a

12

1    reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d

2    1087, 1093 (9th Cir.1998) (internal alteration and quotation marks omitted).

3         The Court construes Plaintiff's allegations as alleging that by reviewing Plaintiff's IAs on

4    this issue, Secretary Cate and Warden Allison knew that his religious freedoms were being

5    violated and failed to take preventative/reparative action.

6         However, it is true that "inmates lack a separate constitutional entitlement to a specific

7    prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty

8    interest in processing of appeals because no entitlement to a specific grievance procedure), citing

9    *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988).  "[A prison] grievance procedure is a

10   procedural right only, it does not confer any substantive right upon the inmates." *Azeez v.

11   DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982) *accord Buckley v. Barlow*, 997 F.2d 494, 495 (8th

12   Cir. 1993); *see also Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance

13   procedure confers no liberty interest on prisoner).

14        Nevertheless, a plaintiff may "state a claim against a supervisor for deliberate indifference

15   based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or

16   her subordinates." *Starr v. Baca,* 652 F.3d 1202, 1207 (2011).  This maay be shown via the

17   inmate appeals process where the supervisor reviewed Plaintiff's applicable inmate appeal and

18   failed to take corrective action, allowing the violation to continue.

19        Plaintiff's claims against Secretary Cate and Warden Allison rest exclusively on their

20   supervisorial capacity via their involvement reviewing Plaintiff's IAs regarding his inability to

21   convert to Judaism.  (Doc. 16, 2ndAC, at 6:5-10, 8:9-21.)  Plaintiff fails to allege and is unable to

22   allege that Secretary Cate and Warden Allison had the ability to force the Jewish authorities to

23   allow Plaintiff to convert.  As previously discussed, conversion to the Jewish religion is a purely

24   ecclesiastical endeavor; the Chaplains, Rabbis, and other Jewish authorities do not qualify as state

25   actors in their decisions as to whether Plaintiff may convert; nor do the decisions regarding

26   whether Plaintiff is allowed to or prohibited from converting to the Jewish faith qualify as a

27   public function or joint action.  Further, while Plaintiff has certain rights to exercise his sincerely

28   held religious beliefs, there is no constitutional right for an inmate to obtain conversion where the

1  religious organization has declined to permit it.  Thus, while Plaintiff's desire to convert to the

2  Jewish faith may be sincerely desired, the inability of Chaplain Sharon and/or Moskowitz to

3  provide/facilitate Plaintiff's conversion does not equate to violation of a "federally secured right"

4  that Secretary Cate and/or Warden Allison caused or knew of and acquiesced in.

5      Even though they were aware of and perhaps on notice of Plaintiff's inability to convert to

6  Judaism, it cannot be said that there is a causal connection between Secretary Cate and Warden

7  Allison reviewing Plaintiff's IAs and Plaintiff's inability to accomplish the ecclesiastical task of

8  conversion to the Jewish faith.  Thus, Plaintiff fails and is unable to state a cognizable claim

9  against either Secretary Cate or Warden Allison for their involvement in reviewing his IAs

10  regarding his inability to convert to the Jewish faith.

11      **5. Section 101060.4 of the Department Operations Manual**

12      Finally, in all of the pleadings that Plaintiff has filed in this action, he complains that the

13  Defendants have violated section 101060.4 of Article 6 of CDCR's Department Operations

14  Manual ("the DOM").  (*See e.g.* Doc. 1, Orig. Co., at pp. 6, 8; Doc. 13, 1stAC, at p. 9; Doc. 16,

15  2ndAC, p.4.)  It cannot be said that section 101060.4 requires any of the Defendants to provide

16  Plaintiff the conversion to Judaism that he seeks.  Section 101060.4 provides that "pastoral duties

17  of a chaplain [] shall consist of the following: . . . Administering Sacraments: Baptism,

18  Confession, Communion, Confirmation, Sacrament of the Sick and Marriage. . . ."  However, the

19  existence of regulations such as these governing the conduct of prison employees does not

20  necessarily entitle plaintiff to sue civilly to enforce the regulations or to sue for damages based on

21  the violation of the regulations.  The Court has found no authority to support a finding that there

22  is an implied private right of action under the DOM.  Given that the statutory language does not

23  support an inference that there is a private right of action, the Court finds that Plaintiff fails and is

24  unable to state any claims upon which relief may be granted based on the violation of a given

25  section of the DOM.

26  **II.    CONCLUSION & RECOMMENDATION**

27      Plaintiff's Second Amended Complaint fails to state a cognizable claim against any of the

28  named Defendants.  Given Plaintiff's persistence in attempting to state a causes of action that he

as previously been advised are not actionable, it appears futile to allow further amendment.  The deficiencies in Plaintiff's pleading do not appear capable of being cured through amendment, *Akhtar*, 698 F.3d at 1212-13, and Plaintiff need not be given leave to amend his section 1983 claims.

Accordingly, it is HEREBY RECOMMENDED that this entire action be **DISMISSED** with prejudice and this dismissal should count as a strike for purposes of 28 U.S.C. §1915(g).

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  **Within 30 days** after being served with these Findings and Recommendations, Plaintiff may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. Nov. 18, 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**November 6, 2015**__          _____**/s/ Jennifer L. Thurston**
                                          UNITED STATES MAGISTRATE JUDGE