# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDON LEE WOLCOTT,<br><br>            Plaintiff,<br><br>     v.<br><br>BOARD OF RABBIS OF NO. & SO. CALIFORNIA, et al.,<br><br>            Defendants. | Case No.  1:14-cv-00936-JLT (PC)<br><br>**FINDINGS AND RECOMMENDATIONS TO DISMISS CLAIMS BASED ON THE INABILITY TO CONVERT TO JUDAISM WITH PREJUDICE**<br><br>**(Doc. 16)**<br><br>**30-DAY DEADLINE** |

**I.    Background**

The Court screened Plaintiff's Second Amended Complaint ("SAC") and issued a findings and recommendation to dismiss it because it did not to state any cognizable claims. (Doc. 18.) In his objections, Plaintiff requested to be allowed to proceed on the claims the Court previously found to be cognizable in the First Amended Complaint ("FAC").

In his objections, along with arguing why he believed he should be able to proceed on claims for being unable to convert to the Jewish faith, Plaintiff requested to be allowed to proceed on the claims found cognizable in the FAC.[1] (Doc. 22.) Accordingly, it is recommended that

---

[1] In a separate order, the Court vacated the November 9, 2015 findings and recommendation granted Plaintiff leave to file a third amended complaint is limited only to those claims the Court found to be cognizable in the first amended complaint.

1

Plaintiff's claims based on his inability to convert to Judaism be **DISMISSED WITH PREJUDICE** since all these claims are not cognizable and cannot be amended so as to state cognizable claims. *Akhtar v. Mesa*, 698 F.3d 1202, 1212-13 (9th Cir. 2012).

### A.      Screening Requirement

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally frivolous, malicious, fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2); 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

### B.      Plaintiff's Second Amended Complaint

Plaintiff complains of acts related to his inability to convert to the Jewish faith at California Substance Abuse Treatment Facility ("SATF") in Corcoran, California. In this pleading, Plaintiff has narrowed the list of Defendants to four -- Former CDCR Secretary Matthew Cate, Former Staff Jewish Chaplain Jared Sharon, Former Warden Kathleen Allison, and Staff Jewish Chaplain Lon Moskowitz. Plaintiff seeks preliminary and permanent injunctive relief allowing him to convert to Judaism and seeks monetary damages.

Plaintiff complains that his inability to convert to Judaism has violated his right to "Freedom of Religion." (Doc. 16, 2ndAC, at p. 3.) Plaintiff alleges that the CDCR's "Departmental Operations Manual ("DOM") Article 6, Section 101060.4 requires staff chaplains to provide inmates with confirmations (i.e. conversions) as part of their pastoral duties." (*Id.*) Plaintiff alleges that conversion is essential since Judaism worship is community based, like an extended family, and he must go through conversion to "be regarded as Jewish in the view of the religion." (*Id.*) Plaintiff alleges that he is serving a life sentence and has requested formal conversion but that Chaplain Sharon has denied his request stating, "that the CDCR chaplain policy does not allow inmates to convert to Judaism." (*Id.*, at p. 4.) Because he has not been allowed to convert to Judaism, Plaintiff alleges that he has suffered discrimination. (*Id.* at p. 5.)

Plaintiff also alleges that after Plaintiff sent Chaplain Sharon a proposal in June 2009,

Sharon informed Plaintiff that some of the senior Jewish chaplains, who attended the last state-wide conference were sympathetic to Plaintiff's situation and felt inmates serving life sentences should be afforded the opportunity to convert to Judaism while incarcerated. (Doc. 16, 2ndAC, at p. 6) Sharon agreed to submit Plaintiff's proposal, but did not have authority to approve it. (*Id.*)

In August 2010, when it had been more than a year since this communication with Chaplain Sharon and he had still not been allowed to convert, Plaintiff filed an Inmate Appeal ("IA"). (*Id.*) That same month, Chaplain Sharon interviewed Plaintiff regarding his IA and became upset at Plaintiff, but thereafter granted Plaintiff's appeal stating that he would provide Plaintiff with a course of study and a para-rabbi "to prepare him for conversion and that upon completion Plaintiff would be presented to a Beit Din (Jewish Court of Judgment) that is approved by the Board of Rabbis." (*Id.*, at p. 7.)

Plaintiff alleges that in September 2010 he was diagnosed with central serious retinopathy and macular edema as a result of the stress he experienced from being denied conversion. (*Id.*)

On an occasion between August and October 2010, Plaintiff was not allowed to don Tefillin by the Aleph Institute because Chaplain Sharon indicated that he had not been allowed to convert. (*Id.*) Likewise, the Aleph Institute does not allow Plaintiff to purchase religious packages because he has not converted. (*Id.*)

In November 2010, Plaintiff was put in contact with a para-rabbi due to Chaplain Sharon partially granting Plaintiff's August 2010 IA. (*Id.*) After corresponding with Plaintiff, the para-rabbi indicated that she believed Plaintiff was prepared to make his conversion and she emailed Chaplain Sharon advising of this fac. (*Id.*) However, Chaplain Sharon made no attempt to present Plaintiff to a Beit Din for conversion, so Plaintiff filed a second IA which Chaplain Sharon partially granted on February 1, 2011. (*Id.*)

In the partial grant, Chaplain Sharon indicted that, as of that date, the Board of Rabbis had not officially approved the conversion of those serving life sentences to Judaism. Sharon noted that the Board may grant approval on a case-by-case basis and that he would maintain contact with the Board through Rabbi Moskowitz, and "would inform Plaintiff when and under what conditions conversion to Judaism for lifers is approved." (*Id.*, at pp. 7-8.) Later that same month,

Plaintiff learned that the loss of color and light in his vision was permanent. (*Id.*, at p. 8.) Plaintiff also alleges he has suffered four "mini strokes" because of not being allowed to convert to Judaism. (*Id.*, at pp. 8-9.)

On February 18, 2011, Plaintiff appealed his second IA to the Second Level, seeking presentation to the Beit Din for conversion examination. (*Id.*, at p. 8.) Warden Allison denied Plaintiff's request stating that the Board of Rabbis had not officially approved conversion to Judaism for lifers and that Chaplain Sharon was mistaken to have partially granted Plaintiff's IA. (*Id.*) On April 12, 2011, Plaintiff appealed his second IA to the Third Level where Secretary Cate denied it stating penological reasons existed for the denial and that the decision not to present Plaintiff to the Beit Din for Judaism conversion was within the institution's scope of authority. (*Id.*)

Between August and October of 2011, the Aleph Institute sent two rabbinic school graduates to conduct services for Jewish inmates, but they did not allow Plaintiff to worship with them because Chaplain Sharon indicated that he had not been allowed to convert. (*Id.*)

For the reasons discussed in greater detail below, these allegations do not state any cognizable claims which are actionable under section 1983 such that all such claims should be dismissed with prejudice. *Akhtar*, 698 F.3d at 1212-13. This is not to say that Plaintiff's inability to convert to the Jewish faith because he is serving a life sentence is not a horrible confluence of circumstances. This is simply not the proper forum to redress the issue.

**C.    Legal Standards**

The below legal standards for the claims Plaintiff is attempting to state were specifically stated in the order that screened the FAC. (Doc. 15.) They are once again restated herein since pivotal to the dismissal of these claims with prejudice and in the hopes that by doing so, Plaintiff may be assisted in understanding why he cannot pursue claims under § 1983 from this no doubt heart-wrenching ordeal.

**1. Religion**

Prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

4

1  Inmates retain the protections afforded by the First Amendment, "including its directive that no
2  law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348
3  (1987) (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)). However, " '[l]awful
4  incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a
5  retraction justified by the considerations underlying our penal system.' " *Id*. (quoting *Price v.
6  Johnston*, 334 U.S. 266, 285 (1948)).

7  Claims for violation of the Free Exercise Clause of the First Amendment, RLUIPA, and
8  the Establishment Clause are used to challenge state or government statutes, regulations, and/or
9  established policies. Thus, in order to state a cognizable claim for their violation, a plaintiff must
10 identify an allegedly offending statute, regulation, or established policy. Claims regarding
11 independent actions by state actors who are not following a statute, regulation, or established
12 policy are not cognizable under § 1983 for violation of a plaintiff's rights under the Free Exercise
13 Clause, RLUIPA, or the Establishment Clause. However, a plaintiff may be able to state a
14 cognizable claim for violations of rights under the Equal Protection Clause for discriminatory
15 actions by individual state actors who are not following a statute, regulation, or established
16 policy.

### a. First Amendment -- Free Exercise

18 The First Amendment, applicable to state action by incorporation through the Fourteenth
19 Amendment, *Everson v. Bd. of Educ. of Ewing Twp*., 330 U.S. 1, 8 (1947), "prohibits government
20 from making a law 'prohibiting the free exercise [of religion].' " *Cruz*, 405 U.S. at 322 (alteration
21 in original). A prisoner's right to freely exercise his religion, however, is limited by institutional
22 objectives and by the loss of freedom concomitant with incarceration. *O'Lone*, 482 U.S. at 348.

23 A prison regulation may therefore impinge upon an inmate's right to exercise his religion
24 if the regulation is "reasonably related to legitimate penological interests." *Shakur v. Schriro*, 514
25 F.3d 878, 884 (9th Cir. 2008) (citations omitted). In contesting the validity of a prison regulation,
26 an inmate must also show that his religious practice is "sincerely held" and "rooted in religious
27 belief." *Id.* at 884-85. For screening purposes, it is assumed that Plaintiff's Jewish belief is
28 sincerely held and the practices he desires are rooted in his Jewish beliefs.

### b. RLUIPA

A prisoner's ability to freely exercise his religion is also protected by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). 42 U.S.C. § 2000cc-1. Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government shows that the burden is "in furtherance of a compelling government interest" and "is the least restrictive means of furthering . . . that interest." 42 U.S.C. § 2000cc–1(a) (2012). "While [RLUIPA] adopts a compelling governmental interest standard, [c]ontext matters in the application of that standard." *Cutter v. Wilkinson*, 544 U.S. 709, 722–23 (2005) (alteration in original) (internal quotation and citation omitted). Thus, "[c]ourts are expected to apply RLUIPA's standard with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1124-25 (9th Cir. 2013) (citing *Cutter*, 544 U.S. at 723) (internal quotation marks omitted).

Under RLUIPA, plaintiffs bear the initial burden of persuasion on whether the Policy "substantially burdens" their "exercise of religion." § 2000cc–2(b). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). A "substantial burden" occurs "where the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir.2005) (alteration in original) (quotation omitted).

Damages claims are not available under the RLUIPA against prison officials in their individual capacity, *Wood v. Yordy*, 753 F.3d 899 (9th Cir. 2014); nor in their official capacity because of sovereign immunity, *Sossamon v. Texas*, --- U.S. ---, 131 S.Ct. 1651 (2011); *Alvarez v. Hill*, 667 F.3d 1061, 1063 (9th Cir. 2012).

### c. The Establishment Clause

A government act is consistent with the Establishment Clause if it: (1) has a secular

purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and (3) does not foster excessive governmental entanglement with religion. *Vasquez v. Los Angeles ("LA") County*, 487 F.3d 1246, 1255 (9th Cir. 2007) citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971). It is appropriate to test the viability of a plaintiff's claim of violation of the Establishment Clause under *Lemon* upon screening. *Vasquez,* 487 F.3d at 1255.

Under *Lemon*, a government act is consistent with the Establishment Clause if it: (1) has a secular purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and (3) does not foster excessive governmental entanglement with religion. *See Lemon*, 403 U.S. at 612-13; *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir.1994).

In considering the appropriate balance of these factors, evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination." *Bell*, 441 U.S. at 562. *See Turner*, 482 U.S., at 86-87. To ensure that courts afford appropriate deference to prison officials, prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test which is less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *See, e.g., Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 128 (1977). The proper standard is that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89.

### d. Fourteenth Amendment -- Equal Protection

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur v. Schriro*, 514 F.3d 878, 891 (9th Cir.2008) (citation omitted). This does not mean, however, that all prisoners must receive identical treatment and resources. *See Cruz*, 405 U.S. at 322 n. 2; *Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir. 1993); *Allen v. Toombs*, 827 F.2d 563, 568–69 (9th Cir. 1987).

"To state a § 1983 claim for violation of the Equal Protection Clause a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon

7

membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166-67 (9th Cir. 2005) (citation and quotations omitted). "The first step in equal protection analysis is to identify the [defendants' asserted] classification of groups." *Id.* (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir.1995)). The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified. *Id.* An equal protection claim will not lie by "conflating all persons not injured into a preferred class receiving better treatment" than the plaintiff. *Id.* (quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir.1986)).

If the action in question does not involve a suspect classification, a plaintiff may establish an equal protection claim by showing that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *San Antonio School District v. Rodriguez*, 411 U.S. 1 (1972); *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir.2004); *Sea River Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d 662, 679 (9th Cir. 2002). To state an equal protection claim under this theory, as a "class of one" a plaintiff must allege that: (1) the plaintiff is a member of an identifiable class; (2) the plaintiff was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Village of Willowbrook*, 528 U.S. at 564. To establish any violation of the Equal Protection Clause, the prisoner must present evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 239-240 (1976); *Serrano v. Francis*, 345 F.3d 1071, 1081-82 (9th Cir. 2003); *Freeman v. Arpio*, 125 F.3d 732, 737 (9th Cir. 1997). Further, where a challenged government policy is facially neutral, disproportionate impact on an identifiable group will satisfy the intent element, but only if it tends to show that some invidious or discriminatory purpose underlies the policy. *See Lee v. City of Los Angeles,* 250 F.3d 668, 686-87 (9th Cir. 2001).

The first step in determining whether prison staff violated Plaintiff's right to equal protection is to identify the relevant class to which he belonged. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1166 (9th Cir.2005). "The groups must be comprised of similarly situated persons so that the factor motivating the alleged discrimination can be identified." *Id.* at

1167.  "An equal protection claim will not lie by 'conflating all persons not injured into a preferred class receiving better treatment' than the plaintiff."  *Id.,* quoting *Joyce v. Mavromatis*, 783 F.2d 56, 57 (6th Cir.1986).

### 3.  Plaintiff's Inability to Convert to Judaism

The prior screening order specified why Plaintiff could not proceed on claims against Chaplains Sharon and Moskowitz, among others, and specifically directed Plaintiff to neither name them, nor again attempt to state any claims against them.  Despite this, Plaintiff persisted to name Chaplains Sharon and Moskowitz as Defendants in the 2ndAC.  Thus, the Court again recites the reasons why Plaintiff may not proceed against them.

An initial determination must be made whether Chaplains Sharon and Moskowitz were "state actors" or acting "under color of state law" in order for Plaintiff to proceed against them in this action both on his claims under § 1983 and RLUIPA -- for which the same standard applies.  *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011).  The first step in the determination is whether the deprivation is the result of a governmental policy.  *Id. ref Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 835 (9th Cir. 1999) citing *Lugar v. Edmondson Oil, Co.*, 457 U.S. 922, 937 (1982).  In all three versions of his allegations, Plaintiff alleges that his religious exercise was burdened by not being allowed to convert to the Jewish faith.

However, in both the Original Complaint, FAC, and SAC Plaintiff made it very clear that the policy that prohibited inmates from converting to Judaism was the policy of the Jewish organization/structure -- not the CDCR.  In the FAC, Plaintiff alleged, and attached exhibits that made it clear, that his inability to convert to Judaism was the policy of the Southern California Board of Rabbis and the California Commission of Jewish Chaplains -- to whom the various Jewish Chaplains who operate within the CDCR report.  (*See* Doc. 13, 1stAC, at pp. 6:13-9:26, 177, 179, 184, 205.)  Whether Chaplains Sharon and Moskowitz (under the Board of Rabbis) were the only Jewish organization/structure operating in the CDCR does not transform their internal, religious policy into government policy.  *Florer*, 639 F.3d at 923-24.  Thus, in the Original Complaint and FAC, the Court found that Plaintiff did not show that his inability to

convert to the Jewish faith was the result of governmental policy.[2]

In the SAC, Plaintiff alleges, "the CDCR chaplain policy does not allow inmates to convert to Judaism." (Doc. 16, p.4.) The change in Plaintiff's pleading to allege that it is a CDCR policy that is preventing him from converting to Judaism is disingenuous and need not be accepted since clearly contradictory to both his prior allegations and the supporting exhibits he submitted therewith. The policy prohibiting inmates from converting to Judaism is not a governmental policy, so it does not provide a basis for a cognizable claim for violation of Plaintiff's rights under the Free Exercise Clause of the First Amendment, RLUIPA, and the Establishment Clause.

Further, neither Chaplain Sharon nor Moskowitz may fairly be considered a state actor. The Supreme Court has held that "state action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (internal quotations and citation omitted). The Supreme Court has identified at least seven approaches to assess whether a private party has acted under color of state law. *Brentwood Acad.*, 531 U.S. at 296. The most likely to be applicable in this situation is either the "public function" or "joint action" approach.

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002). "The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (quoting *Lee*, 276 F.3d at 555). It has specifically been held that a prison chaplain, and organizations with which the chaplain was affiliated, were not engaged in state action when they refused to provide an inmate religious materials or services and refused to recognize the inmate as

---

[2] The fact that Plaintiff is an inmate also does not entitle him greater consideration by the governing board of his religion than a person not incarcerated. Thus, conversion may only be obtained by compliance with the requirements adopted by his religious leaders.

1    Jewish -- such actions were determined to be ecclesiastical rather than public functions.  *Florer*,
2    639 F.3d at 925-26.  Thus, the action by Chaplains Sharon and Moskowitz, of failing to facilitate
3    Plaintiff's conversion, is not a public function.
4       Under the "joint action" approach, "[p]rivate persons, jointly engaged with state officials
5    in the prohibited action, are acting 'under color' of law."  *Lugar*, 457 U.S. at 941.  This occurs
6    when "the state has so far insinuated itself into a position of interdependence with the private
7    entity that it must be recognized as a joint participant in the challenged activity.  This occurs
8    when the state knowingly accepts the benefits derived from unconstitutional behavior."  *Kirtley*,
9    326 F.3d at 1093 (internal quotations and citation omitted).  Whether an inmate is a follower of a
10   particular religion is an ecclesiastical answer to a religious doctrine, not an administrative
11   determination; whereas a decision whether an inmate should be put on an internal prison list as
12   following a particular religion is an administrative determination, *Florer*, 639 F.3d at 926-27, and
13   Plaintiff does not allege that he is not on the list identifying him as Jewish for purposes within the
14   facility, nor do his allegation imply this.  In order to be "joint action" the prison must have
15   engaged in activity with the charged defendant such as desiring the defendant to determine that an
16   inmate is not of a particular religion, or the prison must have derived a benefit from such
17   determination.  *Id.*  There is no basis, even under the most liberal interpretation of Plaintiff's
18   allegations, upon which the trier of fact could determine that the prison engaged in any activities
19   showing a desire or benefit to be derived from Chaplains Sharon and Moskowitz denying
20   Plaintiff's requests to convert to Judaism.  Thus, Defendants Chaplains Sharon and Moskowitz
21   were not state actors or acting under color of state law when they denied Plaintiff's conversion to
22   the Jewish faith for Plaintiff to proceed against them for violation of his rights under the Free
23   Exercise Clause of the First Amendment, RLUIPA, and/or the Establishment Clause.
24      Further, Plaintiff offers no allegations to suggest that he was unilaterally denied Jewish
25   accommodations and/or religious items needed to exercise his faith because he was not allowed to
26   formally convert to Judaism.  The only religious activities that Plaintiff alleges have been
27   infringed on are that he was not allowed to attend a service when the Aleph Institute sent two
28   Yeshivah (rabbinic school) graduates (Doc. 16, SAC, at 8:22-25)*;* when the Aleph Institute sent a

visiting rabbi to speak with Jewish inmates and allow them to don Tefillin Chaplain Sharon indicated that Plaintiff had not been allowed to convert and the visiting rabbi did not allow Plaintiff to participate (*id.*, at 7:13-18); and not being allowed to purchase religious packages by a the Aleph Institute that regarded him as a non-Jew (*id.*, at 7:19-21).  Plaintiff was prohibited from engaging in religious activities in these instances by the Aleph Institute -- which is an outside, religious organization that has not been, and cannot be, pursued in this action.   Thus, Plaintiff fails and is unable to state a cognizable claim against Chaplains Sharon and Moskowitz.

### 4. Supervisory Liability via Inmate Appeals

Plaintiff named Secretary Cate and Warden Allison as defendants because they held supervisory positions in as much as they reviewed his IAs regarding his inability to convert to the Jewish faith at the Second and Third Levels.

Generally, supervisory personnel are not liable under section 1983 for the actions of their employees under a theory of *respondeat superior* -- when a named defendant holds a supervisory position, the causal link between him and the claimed constitutional violation must be specifically alleged.  *See Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979).  To state a claim for relief under this theory, Plaintiff must allege some facts that would support a claim that supervisory defendants either:  personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'"  *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

To show this, "a plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury.  The law clearly allows actions against supervisors under section 1983 as long as a sufficient causal connection is present and the plaintiff was deprived under color of law of a federally secured right."  *Redman v. County of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991)(internal quotation marks omitted)(abrogated on other grounds by *Farmer v. Brennan*, 511 U.S. 825 (1994).

"The requisite causal connection can be established . . . by setting in motion a series of acts by others," *id*. (alteration in original; internal quotation marks omitted), or by "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury," *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir.2001). "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998) (internal alteration and quotation marks omitted).

The Court construes Plaintiff's allegations as alleging that by reviewing Plaintiff's IAs on this issue, Secretary Cate and Warden Allison knew that his religious freedoms were being violated and failed to take preventative/reparative action. However, it is true that "inmates lack a separate constitutional entitlement to a specific prison grievance procedure." *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no entitlement to a specific grievance procedure), citing *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988). "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates." *Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982) *accord Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993); *see also Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner).

Nevertheless, a plaintiff may "state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates," *Starr v. Baca,* 652 F.3d 1202, 1207 (2011). This may be shown via the inmate appeals process where the supervisor reviewed Plaintiff's applicable inmate appeal and failed to take corrective action, allowing the violation to continue.

Plaintiff's claims against Secretary Cate and Warden Allison rest exclusively on their supervisorial capacity via their involvement reviewing Plaintiff's IAs regarding his inability to convert to Judaism. (Doc. 16, 2ndAC, at 6:5-10, 8:9-21.) Plaintiff fails to allege and is unable to

allege that Secretary Cate and Warden Allison had the ability to force the Jewish authorities to allow Plaintiff to convert. As previously discussed, conversion to the Jewish religion is a purely ecclesiastical endeavor. The Chaplains, Rabbis, and other Jewish authorities do not qualify as state actors in their decisions as to whether Plaintiff may convert to their religion. Similarly, their decisions regarding whether Plaintiff may convert do not qualify as a public function or joint action. Further, while Plaintiff has certain rights to exercise his sincerely held religious beliefs, he has no constitutional right to force an organized religion to permit his conversion. Thus, while Plaintiff's desire to convert to the Jewish faith may be sincerely desired, the inability of Chaplain Sharon and/or Moskowitz to provide/facilitate Plaintiff's conversion does not equate to violation of a "federally secured right" that Secretary Cate and/or Warden Allison caused or knew of and acquiesced in.

Even though they were aware of and perhaps on notice of Plaintiff's inability to convert to Judaism, it cannot be said that there is a causal connection between Secretary Cate and Warden Allison reviewing Plaintiff's IAs and Plaintiff's inability to accomplish the ecclesiastical task of converting[3]. Thus, Plaintiff fails and is unable to state a cognizable claim against either Secretary Cate or Warden Allison for their involvement in reviewing his IAs regarding his inability to convert to the Jewish faith.

**5. Section 101060.4 of the Department Operations Manual**

Finally, in all of the pleadings that Plaintiff has filed in this action, he complains that the Defendants have violated section 101060.4 of Article 6 of CDCR's Department Operations Manual ("the DOM"). (*See e.g.* Doc. 1, Orig. Co., at pp. 6, 8; Doc. 13, 1stAC, at p. 9; Doc. 16, 2ndAC, p.4.) The Court cannot read section 101060.4 to require any of the Defendants to provide Plaintiff the conversion to Judaism that he seeks. Section 101060.4 provides that "pastoral duties of a chaplain [] shall consist of the following: . . . Administering Sacraments: Baptism, Confession, Communion, Confirmation, Sacrament of the Sick and Marriage. . . ." However, the existence of regulations such as these governing the conduct of prison employees does not

---

[3] This is not to say that plaintiff could not bring a successful state court action to raise state law claims but, even still, the Court is at a loss as to the nature of such a claim.

necessarily entitle plaintiff to sue civilly to enforce the regulations or to sue for damages based on the violation of the regulations. The Court has found no authority to support a finding that there is an implied private right of action under the DOM. Given the statutory language does not support an inference that there is a private right of action, the Court finds that Plaintiff fails and is unable to state any claims upon which relief may be granted based on the violation of a given section of the DOM.

## II.  CONCLUSION & RECOMMENDATION

Plaintiff's Second Amended Complaint fails to state a cognizable claim based on his inability to convert to the Jewish faith such that further amendment would be futile and need not be allowed. *Akhtar*, 698 F.3d at 1212-13.

Accordingly, the Court RECOMMENDS that the claims in the Second Amended Complaint related to Plaintiff's inability to convert to the Jewish faith, be **DISMISSED WITH PREJUDICE**.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within 30 days** after being served with these Findings and Recommendations, Plaintiff may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. Nov. 18, 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **April 29, 2016**           **/s/ Jennifer L. Thurston**
                                      UNITED STATES MAGISTRATE JUDGE